IN THE UNITED STATE DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY

T.E.C. ENGINEERING, INC.,          :          CASE NO.:  3:25-CV-300-RGJ
7288 Central Parke Blvd.
Mason, Ohio 45040                  :

                               :

   Plaintiff                 :

                                              **COMPLAINT WITH**
vs.                                :          **JURY DEMAND**

PERATON, INC.,                     :
12975 Worldgate Drive
Suite 7118                         :
Herndon, Virginia 20170
                                   :
And
                                   :
JON COLWELL
1908 Frankfort Avenue              :
Apt. No.: 3
Louisville, Kentucky 40206         :

And                                :

TURNER RAY                         :
7605 Marylee Lane
Louisville, Kentucky 40291         :

   Defendants.               :


Plaintiff T.E.C. Engineering, Inc ("TEC"), for its Complaint against Defendants Peraton,

Inc. ("Peraton"), Jon Colwell ("Colwell") and Turner Ray ("Ray") (collectively "Defendants"),

state as follows:


1

## THE PARTIES

1. Colwell and Ray are former employees of TEC.

2. Colwell resides in Jefferson County, in the City of Louisville, Kentucky.

3. Ray resides in Jefferson County, in the City of Louisville, Kentucky.

4. Peraton is a Maryland Corporation headquartered at 12975 Worldgate Drive, Suite 7118 Herndon, Virginia 20170.

5. TEC is an Ohio Corporation headquartered at 7288 Central Park Boulevard, Mason, Ohio 45040.

## JURISDICTION AND VENUE

6. This Court has diversity jurisdiction over this action pursuant to 28 U.S.C. §1332(a) because the controversy is between parties of diverse citizenship and the amount in controversy exceeds $75,000.

7. This Court has federal question jurisdiction over this action because TEC alleges claims under 18 U.S.C. §1836.

8. This Court has personal jurisdiction over Colwell and Ray because they caused tortious injury by an act or omission in the Commonwealth of Kentucky, and the causes of action herein derived from such tortious injury caused by an act or omission in Kentucky.

9. Venue is proper in this Court because Defendants have contracted with and/or committed tortious acts against TEC in and around Louisville, Kentucky.

## FACTUAL BACKGROUND

10. Plaintiff TEC is a small, family-owned engineering firm principally located in Mason, Ohio, but with satellite offices across Ohio and Kentucky. Despite its size, TEC is known for high quality and professional work, having completed over 3,500 projects during its 30 years in business in the spaces of traffic engineering, intelligent transportation systems, civil engineering and surveying. TEC has been recognized multiple times with industry awards for its work. In addition, as a female and minority owned business, TEC is highly sought after for government contracts.

11. Among other things, TEC offers a full range of engineering and support services with respect to Intelligent Transportation Systems ("ITS"). The most valuable aspect of ITS systems are the intelligent message boards that appear on expressways throughout the county, but a full ITS system includes a number of technical parts- cameras, communication systems, fiber-optic cables, wireless and wired devices, radios and other components.

12. Upon information and belief, Peraton was formed in 2017 after the private equity firm Veritas Capital acquired Harris Corporation's government IT services division and renamed it Peraton. As it pertains to this Complaint, Peraton is the successor-in-interest to Northrop Grumman Corp. by virtue of its having purchased the Northrop Grumman Corp.'s IT services division for $3.4 billion in 2021.

**TEC and Northrop Grumman's history on the TRIMARC Project**

13. In 1997 Northrop Grumman's predecessor was selected to design and operate the "Traffic Response and Incident Management Assisting the River Cities" ITS system (the "TRIMARC Project") on a section of I-65 near Louisville, Kentucky. Over time, the TRIMARC Project has expanded to nearly 100 miles of interstate in Kentucky and

Indiana.  From the start, TEC worked with Northup Grumman on the TRIMARC Project.

14. In 2016, the Commonwealth of Kentucky's Transportation Cabinet ("Kentucky") re-bid the TRIMARC Project because it had finished its "Ohio River Bridges" project, which required that the TRIMARC Project expand from primarily weekday peak hour operation to 24-hour operation.  Thus, Kentucky issued an updated Request for Proposal (RFP") seeking ITS services for the management and operation of TRIMARC facility and related infrastructure, system integration involving the equipment and software, maintenance and support of the statewide ITS assets, and operation of the East End Tunnel crossing.

15. Northrop Grumman and TEC determined to continue their longstanding relationship and re-bid for the TRIMARC Project.  More specifically, the parties contemplated the TEC would provide maintenance services for the ITS devices of the TRIMARC Project while Northrop Grumman would provide operators and overall management of the TRIMARC Project, including the East End Tunnel.

16. Thus, in August 2016, Northrop Grumman and TEC entered into a Teaming Agreement to respond to the RFP.  In particular, TEC was to provide "resources and expertise in the area of ITS Systems Operations and Equipment Maintenance" that Northrop Grumman lacked to the project.  TEC was to provide all reasonable efforts in support of the proposal and Northrop Grumman would identify TEC as a proposed subcontractor and contributor to its proposal with Kentucky and, if awarded the prime contract, offer TEC a subcontract for its work under the proposal.  Ultimately, Northup Grumman and TEC were awarded the TRIMARC project.

17. Among other things, the Teaming Agreement provided in Section 6 that:

> During the course of this Agreement, the Parties shall disclose and protect all proprietary and/or competition sensitive information in accordance with the Non-Disclosure Agreement executed between the Parties, which is attached as Exhibit B and is hereby incorporated herein…**The obligations of the Non-Disclosure Agreement shall survive the expiration or termination of this Agreement.**

(A copy of the Teaming Agreement is attached to this Complaint as Exhibit A.)

18. In addition, the Parties signed a Non-Disclosure Agreement to protect confidential information exchanged in preparing the bid on the TRIMARC Project. Northup Grumman and TEC agreed to only exchange information on a "need to know" basis in order to prepare the bid, and to keep such information confidential. (A copy of the Non-Disclosure Agreement is attached to this Complaint as Exhibit B).

19. In addition, TEC requires all of its employees to sign off on its Employee Handbook, which in relevant part includes the following restrictions on employees:

> **Confidentiality**
>
> There must be no disclosure of any confidential information or trade secrets to anyone outside the Company without appropriate authorization. Confidential information may include internal reports, policies, procedures, and other internal business-related communications. Trade secrets may include information regarding the development of systems, processes, products, design, instruments, formulas, and technology. In addition, always respect financial disclosure laws and third party intellectual property.
>
> It is an employee's duty and responsibility to safeguard all confidential information.
>
> \*   \*   \*
>
> Confidential information may be disclosed and/or discussed only on a "need to know basis." Conversation of a confidential nature must never be held within earshot of the public or clients.

(Excerpt Pages from the Employee Handbook are attached to this Complaint as Exhibit C).

5

20. In addition to the above, the Employee Handbook also addressed confidentiality requirements for departing employees.  In relevant part, it provides:

> During your employment, you may be privy to confidential business information and trade secrets.  These include but are not limited to financial information, fringe benefits, customer information and contact, customer contracts, business practices, etc.  You are required to keep this information strictly confidential.  Not doing so would violate TEC Engineer's rights, the Ohio Trade Secrets Act and the Kentucky Trade Secret Act.

21.  After being re-awarded with the TRIMARC Project, Northup Grumman and TEC entered into a subcontract (as amended from time to time, the "Subcontract") to carry on the project.  More Specifically, the Subcontract tasked TEC with carrying out the implementation and maintenance of ITS services part of the TRIMARC Project.  (A copy of the Subcontract is attached to this Complaint as Exhibit D).

22. In 2021, Peraton purchased Northup Grumman's IT business, including its interest in the TRIMARC Project.

### TEC's Performance under the TRIMARC Project Subcontract

23. In 1999, near the start of the TRIMARC Project, TEC hired Ray to act as its chief technician to manage the TRIMARC Project.  Over time, as the TRIMARC Project grew from a small number of installations to several hundred miles of installations, TEC developed the techniques, processes and procedures to manage, operate and maintain a complex ITS system

24. These techniques, processes, and procedures are proprietary and confidential information belonging to TEC developed specifically during the course of the TRIMARC Project and applied in TEC's other ITS jobs since then.  In other words, this confidential information was developed by TEC at great expense and is not

generally known outside of the few firms that are qualified to operate ITS systems of the complexity of the TRIMARC Project.

25. TEC's teams of technicians on TRIMARC, including Ray, managed the system for over 20 years, and TEC has deployed the practices and procedures developed there throughout its ITS operations.  These practices and procedures provide TEC's competitive advantage in its ITS space.  Indeed, proprietary systems developed by TEC and Ray are used by TEC not only on the TRIMARC Project, but also by TEC on its Ohio projects and international projects.  In other words, TEC employees are both critical to TEC's entire ITS product infrastructure as well as hold significant confidential information on TEC's methods, practices and procedures in addressing ITS projects.

26. Recognizing the importance of these employees to TEC's business, TEC and Peraton agreed in the Subcontract that Peraton could not poach TEC's employees.  In the Subcontract with Peraton, Article IX is headed "**Key Personnel, Personnel and Non Solicitation of Personnel.**"

27. Article IX(E) identifies the "key personnel" on the TRIMARC Project:

> The Seller's employees identified below are key personnel, important to the successful performance of the work under this Subcontract. …

> | Position | Employee Name |
> |---|---|
> | Lead ITS Field Technician | Turner Ray |

28. Article IX(F) of the Subcontract prohibits Peraton from soliciting any of the TEC's employees who worked on the TRIMARC Project, including the specifically identified "key personnel".  It states:

**Peraton Inc.'s obligations and commitments under this Agreement, including any non-solicitation provisions, apply only to its Technology Services Sector, System Modernization and Services Division.** Neither Party shall, during the term of this Agreement, without the advance written consent of the other, solicit for employment any person(s) employed by the other and working on the specific Task Order(s) covered by this Agreement. The foregoing shall not prohibit either party from having employment discussions with, or hiring the employees of the other party who: 1) Have terminated employment with the other party of their own volition; 2) Respond to or apply for positions offered through the normal process of general public advertisement; or 3) Are hired as a result.

29. As it pertains to this dispute, TEC staff – and specifically the employees at issue in this dispute – performed all maintenance on TRIMARC field devices, including installation, diagnostics, preventative maintenance, and integration.

### Peraton Seeks to Terminate the Subcontract; <u>Reminded of Obligation to Not Solicit TEC's employees</u>

30. Although TEC and Northup Grumman had worked together on the TRIMARC Project for 25 years, as soon as Peraton purchased Northup Grumman's interest in 2021, it began to undermine the Subcontract and to determine that it wished to end it.

31. Late in 2022, Peraton was notified that Kentucky was not renewing its contract to provide services for the East End Tunnel portion of the TRIMARC Project.

32. In January 2023, at a quarterly meeting on the TRIMARC Project, Peraton informed TEC representatives that its loss of the East End Tunnel project would have no effect on TEC's Subcontract.

33. However, upon information and belief, this representation was false when made and Peraton had already determined to end TEC's involvement in the TRIMARC Project and poach TEC's employees to do it.

34. Upon information and belief, by the end of January, Peraton's private equity ownership had instructed that it make up the lost revenues from the loss of the East End Tunnel portion of the TRIMARC Project by any means necessary.

35. On February 9, 2023, Ed Williams, Vice President of TEC, was called by Chip Weisman of Peraton.  Chip Weisman has worked with TEC on the TRIMARC Project for many years, going back long before Peraton acquired an interest in the project. Mr. Weisman informed Mr. Williams that Peraton had determined to end the Subcontract on June 30, 2023, but did not wish TEC to know that fact.  Mr. Weisman had received permission to inform TEC after arguing that TEC's 25-year period of managing the TRIMARC Project at the very least entitled it to notice that Subcontract would be terminated.

36. Mr. Weisman specifically told Mr. Williams that the termination was not a performance issue as TEC had performed well on its project over the years but was rather the requirement that Peraton make more money from the TRIMARC Project.  In response, Mr. Williams told Mr. Weisman that while he was sorry to lose the TRIMARC Project that Peraton should be aware that the TEC employees working on the TRIMARC Project were not to be solicited as TEC fully intended to employ them on other projects.

37. Two weeks later, on February 24, 2023, TEC received a formal notice from Peraton stating that it would not be extending the term of the Subcontract after its alleged end

on June 30, 2023.  (A copy of the notice is attached to this Complaint as Exhibit E). Although Exhibit D bears a date of February 10, 2023 on its face, TEC first received it on February 24.

38. TEC came to the conclusion that Peraton likely did not have the right to terminate the Subcontract on June 30, 2023, but decided that in light of Peraton's treatment of TEC that it also wished to end its association with Peraton.  However, TEC did not wish to end its ability to compete for ITS projects in Kentucky and elsewhere.  Beyond TRIMARC, TEC presently manages dozens of ITS projects where former TRIMARC employees could be utilized.

39. Indeed, after receiving Peraton's February 10, 2023 notice, TEC immediately began making plans to re-staff its TRIMARC Project employees on other ITS projects where their services were needed and to begin bidding on new ITS projects to redeploy the TRIMARC Project employee's expertise.

40. Specifically, in anticipation of being able to redeploy the TRIMARC Project employees to new ITS Projects, TEC has bid on and, in some cases, already been awarded ITS contracts on several Kentucky ITS projects – including a subcontract on the East End Tunnel maintenance contract that Peraton had just lost.  Without the TRIMARC Project employees, TEC has been forced to withdraw its bids on some of these projects and/or subcontract work that it intended the TRIMARC Project employees to do, both placing strain on TEC's overall ITS business and leading to lost profits.

41. Concerned that Peraton may be planning to solicit employees that TEC intended to utilize elsewhere, on March 1, 2023, TEC, by counsel, sent a letter to Peraton that,

10

among other things, reminded Peraton of the non-solicitation agreement between the parties. Counsel for TEC wrote:

> Second, TEC has been made aware that after the termination of certain previous contracts between TEC and [Peraton], certain employees were solicited of TEC to work for [Peraton]. In light of this, TEC wishes to remind Peraton that Peraton covenanted in Article IX of this Agreement to not solicit TEC's employees without TEC's advance written consent. TEC does not consent to Peraton's solicitation of any of its employees, and will insist on Peraton's strict compliance with its non-solicitation obligations.
>
> (A copy of the Letter is attached to this Complaint as Exhibit F).

42. On March 15, 2023, Peraton responded by letter stating: "We take all of our contractual obligations seriously, including non-solicitation provisions as provided for in Article IX of the Subcontract." It turns out that this statement was false when made and designed to lure TEC into complacency during the balance of the Subcontractual term. (A copy of Peraton's response is attached to this Complaint as Exhibit G).

43. At the same time, aware that the TRIMARC Project was a complex ITS project, Ed Williams contacted Peraton in order to offer TEC's support in training and transitioning services to Peraton's staff and/or new subcontractor on the TRIMARC Project. Mr. Williams specifically informed Peraton that, while TEC would not consent to its soliciting TEC's TRIMARC Project employees, TEC was willing to make them available during a transition period to help Peraton in onboarding its own employees onto the TRIMARC Project.

44. Despite multiple offers along these lines in March and April 2023, Peraton never responded to TEC's offer to provide transition services for Peraton's employees.

45. Upon information and belief, Peraton never responded because it had either already had solicited TEC's employees or was already planning to solicit TEC's employees in violation of the Subcontract.

46. On June 13, 2023, Ed Williams called the last time to coordinate the transition and was informed that the transition "had already been taken care of."

47. Unbeknownst to TEC, the transition issue "had already been taken care of" because Peraton had already poached TEC's employees in violation of the non-solicitation clause in the Subcontract.

48. The Subcontract terminated on June 30, 2023.

49. On the TRIMARC Project, Ray was responsible for documenting the work TEC employees performed.

50. The documentation would include emails, weekly activity reports, pricing quotes, meeting notes, among other documentation.

51. Ray would have the documentation on the desktop computer provided to him by TEC.

52. At the completion of the project, TEC discovered that Ray took the desktop computer with him and has not returned it.

53. TEC has almost no documentation from the TRIMARC Project because Peraton and/or Ray did not provide it to TEC during the TRIMARC Project and have not done so since TEC left the TRIMARC Project.

## Peraton Solicits TEC's Employees

54. Peraton did not even wait until after the Subcontract had terminated to breach the Subcontract's non-solicitation clause.

55. Later on the same day, June 13, 2023, that Mr. Williams had been told that the transition of the TRIMARC Project was "taken care of," he spoke with Ray, the principal employee of TEC with respect to the TRIMARC Project. Ray informed Mr. Williams that Peraton had "made him an offer that he could not refuse" and that he was considering the offer. Ray informed Mr. Williams that at least one other employee on the TRIMARC Project had received a similar offer.

56. Upon information and belief, Peraton approached every one of TEC's employees working on the TRIMARC Project.

57. Pursuant to the agreement between the parties, Peraton received TEC's salary information in order to provide that information to the ultimate client, Kentucky. Upon information and belief, Peraton used this information – not for purposes of the Subcontract – but instead to solicit TEC's employees by making them "an offer that they could not refuse."

58. On June 19, 2023, Ray submitted his resignation to Mr. Williams, effective June 30, 2023, the date the TRIMARC Project's Subcontract terminated.

59. On June 19, 2023, Colwell – another key employee on the TRIMARC Project – also submitted his resignation to Mr. Williams, effective June 30, 2023.

60. Ray and Colwell were the two primary employees performing services for TEC on the TRIMARC Project.

61. Upon information and belief, both Ray and Colwell submitted their resignations in a coordinated manner after being solicited and promised employment by Peraton, in violation of Peraton's non-solicitation covenant.

62. Peraton offered a third employee on the TRIMARC Project, Dwayne McCauley, Jr., a position with Peraton, and even altered the job posting requirements so that Mr. McCauley would qualify for the position, but he declined to take the job with Peraton.

63. This news that Peraton has poached Ray and Cowell came as a shock to TEC. As explained above, TEC had been informed in writing just a few months prior that Peraton intended to honor its contractual obligations, including specifically the non-solicitation clause. Thus, instead of transition planning and adjusting workload to deal with an employee exodus, TEC had instead been biding on ITS contracts and moving other employees away from ITS projects in anticipation of the TRIMARC Project employees taking on expanded roles on other projects throughout TEC's project portfolio.

64. Moreover, Ray and Colwell were critical employees for TEC beyond the TRIMARC Project itself.

65. Ray has spent approximately 25 years working on ITS projects for TEC. He is a Master Electrician and is certified by the International Municipal Signal Association and the American Traffic Safety Services Association. Not just with respect to the TRIMARC Project, but with respect to all of TEC's ITS project, Ray provided critical expertise that may be impossible to replace – which is the very point of having a non-solicitation clause in the first place. Indeed, TEC has spent the past 25 years investing in Ray's credentials and expertise so as to make him irreplaceable to TEC.

66. In addition, over the past 25 years Ray has worked with TEC's management to design and implement nearly all of TEC's policies, practices and procedures, with respect to the implementation, management, maintenance and development of ITS systems. In

14

particular, the TRIMARC Project involves thousands of devices of all types – cameras, radios, fiber optics, bucket trucks, battery systems, backup and redundancy systems – that are both wired and wireless, and that all need to communicate with each other. The practices and procedures developed by TEC for managing these interrelated systems are a competitive differentiator between TEC and other companies bidding on ITS projects. Those practices and procedures cannot help but be disclosed to Peraton – a competitor – by its wrongful hiring of Ray and Colwell.

67. In addition to the above, certain proprietary switches and connections used by TEC in its ITS systems were developed by Ray during his employment, and he regularly built proprietary ITS components for TEC's other ITS projects. This confidential information of TEC is mission critical to TEC's performance of ITS projects.

68. Colwell spent 11 years working for TEC, under the direction and training of Turner Ray. Although junior to Turner Ray, he has much of the same certifications and training and is privy to as broad a batch of TEC's confidential information. Indeed, in many ways he would have been the natural successor to Ray had Peraton not poached him as well.

69. Peraton's solicitations of TEC employees were and are intentional, willful and malicious actions intended to illegally and tortiously interfere with TEC's business relationships with its current employees and were also an intentional, willful and malicious misappropriation and continued attempt to misappropriate TEC's trade secrets.

15

**FIRST CLAIM FOR RELIEF**
**BREACH OF TEAMING AGREEMENT AGENT**
**CONTRACT BY PERATON**

70. TEC incorporates the preceding paragraphs as if fully set forth herein.

71. The Teaming Agreement that is attached to this Complaint as Exhibit A is a valid and legally enforceable contract that Peraton entered into freely without duress.

72. In light of the facts and allegations listed above, Peraton has materially breached the Teaming Agreement with TEC.

73. TEC has been damaged by Peraton's breach of the Teaming Agreement in an amount to be determined at trial.

74. Peraton's breach was malicious, willful, wanton, and done with an intent to injure TEC and its business.

**SECOND CLAIM FOR RELIEF**
**BREACH OF TRIMARC SUBCONTRACT BY PERATON**

75. TEC incorporates the preceding paragraphs as if fully set forth herein.

76. The TRIMARC subcontract is a valid and legally enforceable contract that Peraton entered into freely and without duress.

77. In light of the facts and allegations listed above, Peraton has materially breached the TRIMARC subcontract with TEC.

78. TEC has been damaged by Peraton's breach of the TRIMARC subcontract in an amount to be determined at trial.

79. Peraton's breach was malicious, willful, wanton, and done with an intent to injury TEC and its business.

16

### THIRD CLAIM FOR RELIEF
### INTENTIONAL TORTIOUS INTERFERENCE WITH
### PROSPECTIVE CONTRACTUAL RELATIONS
### BY PERATON

80. TEC incorporates the preceding paragraphs as if fully set forth herein.

81. Upon information and belief, Peraton has intentionally interfered with the business relations of TEC by purposely inducing and seeking to cause TEC's customer(s) or prospective customer(s) to fail to engage in a business relationship with TEC, end their business relation with TEC, and/or enter into a business relationship with a competitor.

82. Upon information and belief, Peraton has sought to and is continuing to communicate with TEC's customer(s) to garner their business.

83. Peraton's tortious interference with TEC's prospective economic advantage has resulted in and will continue to result in TEC being irreparably damaged, including, but not limited to, damage to its reputation, its contracts, its business opportunities and monetary damages as yet undetermined.

84. TEC has been damaged by Peraton's tortious interference in an amount to be determined at trial.

85. Peraton's tortious interference was malicious, wanton, and done with an intent to injure TEC and its business.

### FOURTH CLAIM FOR RELIEF
### INTENTIONAL TORTIOUS INTERFERENCE WITH
### CONTRACTUAL RELATIONS BY PERATON

86. TEC incorporates the preceding paragraphs as if fully set forth herein.

87. The TRIMARC subcontract between Peraton and TEC prohibits Peraton from competing with TEC, from soliciting TEC's customers or prospective customers, from soliciting TEC's employees, and from using or disclosing TEC's confidential information.

88. Peraton has, without justification of privilege, interfered with or attempted to interfere with the Teaming Agreement through the actions and inactions described above.

89. TEC has been damaged by Peraton's intentional tortious interference in an amount to be determined by trial.

90. Peraton's interference was malicious, willful, wanton, and done with an intent to injury TEC and its business.

**FIFTH CLAIM FOR RELIEF**
**INTENTIONAL TORTIOUS INTERFERENCE**
**WITH PROSPECTIVE CONTRACTUAL RELATIONS**
**BY COLWELL AND RAY**

91. TEC incorporates the preceding paragraphs as if fully set forth herein.

92. Upon information and belief, Colwell and Ray have intentionally interfered with TEC's prospective contractual relations by purposely inducing and seeking to cause TEC's customer(s) or prospective customer(s) to fail to engage in a business relationship with TEC, to end their business relationship with TEC, and/or to enter into a business relationship with a competitor.  As described above, Colwell and Ray have done so with improper purpose and by improper methods.

93. Upon information and belief, Colwell and Ray have sought to, and are continuing to, communicate with TEC's customers and prospective customers to gain their business.

18

94. Colwell and Ray's tortious interference with TEC's prospective contractual relations has resulted in, and will continue to result in TEC being irreparably damaged, including, but not limited to, damage to its reputation, its contracts, its business opportunities, and monetary damages as yet undetermined.

95. TEC has been damaged by Colwell and Ray's tortious interference in an amount to be determined at trial.

96. Colwell and Ray's tortious interference was malicious, wanton, and done with an intent to injury TEC and its business and in reckless disregard of TEC's rights, justifying an award of punitive and/or exemplary damages.

## SIXTH CLAIM FOR RELIEF
## UNFAIR COMPETITION BY COLWELL AND RAY

97. TEC incorporates the preceding paragraphs as if fully set forth herein.

98. Colwell and Ray's aforementioned unlawful behavior constitutes unfair competition.

99. Colwell and Ray's conduct was undertaken with the intent to interfere with and disrupt TEC's business.  Colwell and Ray's acts have resulted in and continue to result in Colwell and Ray's and Peraton's wrongfully procured competitive advantage, and competitive disadvantage of TEC.

100. Colwell and Ray's actions are intentional, malicious, and unjustified in law.

101. As a proximate result of Colwell and Ray's actions and conduct amounting to unfair competition, TEC has been and will continue to be irreparably injured, including but not limited to, the loss of its competitive edge, customer goodwill and confidential information and trade secrets.

102.    Due to Colwell and Ray's unfair competition, the misuse and disclosure of confidential information and trade secrets, as well as the loss of TEC's competitive advantage and customer goodwill, TEC is entitled to damages including, but not limited to, the loss of profits inclusive of interest, cost and attorney fees.

### SEVENTH CLAIM FOR RELIEF
### MISAPPROPRIATION OF TRADE SECRETS
### BY PERATON (DEFEND TRADE SECRETS ACT)

103.    TEC incorporates the preceding paragraphs as if fully set forth herein.

104.    Upon information and belief, Peraton's activities described above constitute actual or threatened misappropriation of TEC's trade secrets a violation of the Defend Trade Secrets Act, codified under 18 U.S.C. §1836, *et seq.*

105.    TEC has been or will be damaged by Peraton's misappropriation of its trade secrets and/or threatened misappropriation of trade secrets in an amount to be determined at trial.

106.    Peraton's actual or threatened misappropriation of TEC's trade secrets was malicious, willful, wanton, and done with an intent to injury TEC and its business.

### EIGHTH CLAIM FOR RELIEF
### MISAPPROPRIATION OF TRADE SECRETS BY
### PERATON (KENTUCKY UNIFORM TRADE SECRETS ACT)

107.    TEC incorporates the preceding paragraphs as if fully set forth herein.

108.    Upon information and belief, Peraton's activities described above constitute actual or threatened misappropriation of TEC's trade secrets of violation of Kentucky Uniform Trade Secrets Act, codified under KRS 365.880-365.900.

109. TEC has been or will be damaged by Peraton's misappropriation of its trade secrets and/or threatened misappropriation in an amount to be determined at trial.

110. Peraton's actual or threatened misappropriation of TEC's trade secrets was malicious, willful, wanton and done with an intent to injure TEC and its business.

## NINTH CLAIM FOR RELIEF
## MISAPPRORIATION OF TRADE SECRETS
## BY COLWELL AND RAY (DEFEND TRADE
## SECRETS ACT)

111. TEC incorporates the preceding paragraphs as if fully set forth herein.

112. Upon information and belief, Colwell and Ray's activities described above constitute actual or threatened misappropriation of TEC's confidential proprietary business information, which constitutes trade secrets as defined in the Defend Trade Secrets Act, codified under 18 U.S.C. §1836, *et seq.*, in violation of the Defend Trade Secrets Act, 18 U.S.C §1836, *et seq.*

113. Colwell and Ray's actual or threatened misappropriation of TEC's trade secrets was malicious, willful, wanton, reckless and done in complete disregard of TEC's rights thereto and with an intent to injury TEC and its business.

114. TEC's trade secrets are confidential and proprietary and derive independent economic value by not being generally known, or reasonably ascertainable by proper means, by competitors or others who can derive value from disclosure or use, including Colwell and Ray.

115. TEC took reasonable measures under the circumstances to maintain the secrecy of all trade secrets.

116.    As an industry leader in traffic engineering, intelligent transportation services, civil engineering and surveying, TEC's business generally, and in the service and products it provides by use of its trade secrets specifically, move in and through interstate commerce.

117.    TEC has been and will be damaged by Colwell and Ray's misappropriation of its trade secrets and/or threatened misappropriation of trade secrets and seeks actual damages in an amount to be determined at trial, including but not limited to the value of the unjust enrichment caused by Colwell and Ray's misappropriation and benefit therefrom.

118.    As a direct and proximate result of Colwell and Ray's willful and malicious misappropriation of TEC's trade secrets, TEC also seeks an award of exemplary damages, attorney fees, and costs, including costs incurred in conducting any forensic investigations that will be required to determine the full scope of misappropriation.

**TENTH CLAIM FOR RELIEF**
**MISAPPROPRIATION OF TRADE SECRETS BY**
**COLWELL AND RAY (KENTUCKY UNIFORM TRADE SECRETS ACT)**

119.    TEC incorporates the preceding paragraphs as if fully set forth herein.

120.    Upon information and belief, Colwell and Ray's activities described above constitute actual or threatened misappropriate of TEC's confidential and proprietary business information, which constitute trade secrets as defined in the Kentucky Uniform Trade Secrets Act, KRS 365.880-365.900.

121.    Colwell and Ray's actual or threatened misappropriation of TEC's trade secrets was malicious, willful, wanton, reckless and done in complete disregard with TEC's rights thereto and with an intent to injure TEC and its business.

122.   TEC has been and will be damaged by Colwell and Ray's willful misappropriation of its trade secrets and/or threatened misappropriate of trade secrets, and seeks actual damages in an amount to be determined at trial, including but not limited to the value of the unjust enrichment caused by Colwell and Ray's misappropriation and benefit therefrom.

123.   As a direct and proximate result of Colwell and Ray's misappropriation of TEC's trade secrets, TEC also seeks an award of trouble damages and attorney fees and is permitted by the Kentucky Uniform Trade Secrets Act.

## PRAYER FOR RELIEF

WHEREFORE, TEC respectfully requests joint and several liability against Defendants, and more specifically requests that the Court:

1. Enter Judgment in favor of TEC and against the Defendants

2. Declare that the Defendants' conduct has been willful and that the Defendants acted with fraud, malice and oppression.

3. Order any ill-gotten gains and profits Peraton has received because of its breach be held in constructive trusts for the benefit of TEC.

4. Enter preliminary and permanent injunctions enjoining the Defendants, directly or indirectly, and whether alone or in contact with others, including any officer, agent, employee and/or representative of Peraton :

   a. To cease breach of the agreements with TEC;

   b. To cease using, permitting access to, or disclosing TEC's trade secrets and confidential information;

    c.  To cease soliciting any TEC employee, or independent contractor hired by TEC, or initiating any further contact or communications with TEC's employees or contractors until May 1, 2026;

    d.  To refrain from hiring or employing any TEC employee or independent contractor, who has been solicited in violation of the agreements; and

    e.  To refrain from using, disclosing, or transmitting any purpose, including the solicitation of TEC's employees, any and all of TEC's confidential information and/or trade secrets.

5.  Enter judgment allowing TEC actual damages from the Defendants adequate to compensate TEC for the Defendant's activities complained of herein and for any injury complained of herein, including, but not limited to, interest and costs, in an amount that TEC estimates currently exceeds $500,000.00;

6.  Enter judgment awarding enhanced, trebled, exemplary and special damages as permitted by law, in an amount to be proven at trial;

7.  Enter judgment awarding attorney fees and costs; and

8.  Order such other relief as the Court deems just and reasonable.

## JURY DEMAND

Plaintiff requests a trial by jury on all issues so triable.

Respectfully submitted,

 /s/R. Gary Winters
R. Gary Winters  (85625)
McCaslin, Imbus & McCaslin
600 Vine Street, Suite 800
Cincinnati, Ohio 45202
Phone:  513-421-4646
Fax:  513-421-7929
e-mail: rgwinters@mimlaw.com
**Attorneys for Plaintiff**

Q/PJSMITH/20240922/TEC Engineering/ Complaint - Kentucky

25